UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORP.,:<br>as Receiver for Burritt Interfinancial<br>Bancorporation, : | |
| Plaintiff, : | Docket No. 3:00CV554 (JCH) |
| VS. : | |
| WINSTED LAND DEVELOPMENT CO. ,:<br>et al., | |
| : | |
| Defendants. | September 3, 2004 |

MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR ORDER TO SHOW CAUSE
AND REQUEST FOR HEARING THEREON

I.  **Introduction**

The parties executed a Settlement Agreement and Release, which was approved by this Court on June 29, 2001. (Exhibit A). The Settlement Agreement provided at Paragraph 6A that judgment in the amount of $2,599,995.70 (plus interest, costs and fees) would enter in favor of the FDIC and against Defendant John Lombard, individually, in this case as well as two related cases, FDIC v. Knollwood Dev. Assoc., et al., docket number 3:00CV00555 (JCH) and FDIC v. Knollwood Dev. Assoc., et al., docket number 3:00CV00556 (JCH). However, Paragraph 6E of the Settlement Agreement provided that the FDIC would forbear from enforcing the judgment against John Lombard.

In order to induce the FDIC to agree to the terms of the Settlement Agreement, defendant John Lombard submitted financial statements. Paragraph 10 of the Settlement Agreement provided that in the event that any of the financial information submitted by John Lombard was

false, inaccurate or misleading, the FDIC would be permitted to enforce collection of its judgment against him.

Specifically, Paragraph 10 states in relevant part:

> In the event that it is determined by a court of competent jurisdiction that any of the Lombard Parties have knowingly made or invited reliance upon a false, forged or counterfeit statement, documents or thing in connection with this Settlement Agreement, or that any of the Lombard Parties have knowingly provided material information to the FDIC which is substantially inaccurate or incomplete, in a manner which would affect the fundamental premises on which this Settlement Agreement is based, then as to the party or parties who made or invited reliance upon a false, forged or counterfeit statement, document or thing or who provided such material and substantially inaccurate or complete information, this Settlement Agreement shall be void and, to the extent that the FDIC has not sold or transferred the underlying obligations, such parties obligations to the FDIC shall be reinstated in accordance with their original terms.

The Government now seeks to enforce payment of the judgment entered against John Lombard based upon the following reasons.

## II. Statements that are Substantially False, Misleading and Inaccurate

Mr. Lombard submitted a financial statement to the FDIC on September 12, 1999 (Exhibit B), which the FDIC relied upon when it entered into the Settlement Agreement. Discussed below are various discrepancies between the information provided in Mr. Lombard's financial statement, as compared to other sources of information obtained by the FDIC since the approval of the Settlement Agreement.

A. **Employment**

In the top section of page one of Mr. Lombard's September, 1999 financial statement (hereinafter "FS"), in the box entitled "Employed by", Mr. Lombard stated "Manage wife & children's assets".[1] Mr. Lombard also left the box entitled "Previously Employed By" blank.

However, on February 26, 1998 (twenty months prior to submission of his FS to the FDIC), Mr. Lombard applied for a $3 million life insurance policy to CNA - Valley Forge Life. (Exhibit C). Mr. Lombard stated in the CNA application that his occupation was "real estate owner and developer" and his employer was the "Lombard Group", not his wife and children; and further that he had been employed by the Lombard Group for 15 years. Thus, at the time of the Settlement Agreement, John Lombard had been employed by the Lombard Group for the entire length of his marriage (12 years), as well as three years prior to his marriage.

Mr. Lombard further described his duties in the CNA application as:

> Management and real estate development in firm which owns and develops commercial retail real estate; oversees the real estate development and makes contacts with subcontractors; spends 99% of time at the office which has 2 employees.

Mr. Lombard's statements in the CNA application were consistent with a March 23, 1998 news article which identifies Mr. Lombard as the "managing partner for the Lombard Group, a real estate investment company" which, at the time, was participating in a Waterbury development project. (Exhibit D).

---

[1] John and Lisa Lombard were married in 1987, and thus had been married for 12 years at the time the Settlement Agreement was executed.

On September 29, 1998 (one year prior to submission of his FS to the FDIC), Mr. Lombard stated in a PaineWebber account application that he was self employed as a real estate investor (Exhibit E).

Additionally, when Mr. Lombard submitted an application on November 1, 1998 to open an investment account with DLJ Direct, Inc. (an investment company), he indicated that he was self employed with the Lombard Group, and described his occupation as a Real Estate Investor. (Exhibit F).

Mr. Lombard was required to disclose to the FDIC copies of the CNA and PaineWebber financial statements as part of the settlement process, but he failed to comply with that requirement. Rather, Mr. Lombard stated in his response to Question 46, appended to the FS (Exhibit B) that:

> I have not had any financial statement prepared for or by me, nor have I issued any financial statement to any bank, financial institution, firm or person within the last 5 years except: (identify and attach copies of all such financial statements to the Affidavit as collective Exhibit "B"). Financial Statements issued to: Citizen's Bank, Naugatuck Savings Bank, American Bank. (Exhibit F).

Mr. Lombard's description of his employment in his life insurance policy and PaineWebber application are far different than the statements contained in his FS. Furthermore, Mr. Lombard sent a letter to the FDIC dated September 27, 1999, supporting the representations in his FS. Mr. Lombard stated in the September 27, 1999 letter that his "workload is down to a minimum" and "I spend more time these days raising our two children". (Exhibit G). Yet, on October 15, 1999, only eighteen days after Mr. Lombard reported his "Mr. Mom" lifestyle to the FDIC, he also wrote to the Senior Vice President of Citizens Bank concerning his five pending

multi-million dollar real estate deals. The October 15, 1999 letter was signed by John Lombard on Lombard Group letterhead. (Exhibit H).

### B. Cash on Hand and in Banks

In the "Assets" column of his September, 1999 FS, Mr. Lombard lists cash on hand as $59.00.

Yet, in his CNA life insurance application of February 26, 1998, he claimed cash of $900,000.00. (Exhibit C). Then, on September 29, 1998, Mr. Lombard submitted an account application to PaineWebber in which he listed liquid assets of $400,000.00. (Exhibit E).

### C. Real Estate Holdings

Mr. Lombard lists "0" real estate holdings on the FS that he submitted to the FDIC. Mr. Lombard stated in his response to Question 10, appended to the FS (Exhibit B) that:

> I own no real estate, including mineral interests therein, of any nature whatsoever, except: (list address, legal description and date and cost of acquisition of all real estate owned): Raw land (82 acres) ½ interest, Winsted, CT under Winsted Land Development.

Yet, in the February 26, 1998 CNA insurance application, Mr. Lombard listed real estate holdings of $42 million. (Exhibit C). The CNA application is illustrative of not only the value of Mr. Lombard's real estate holdings; but also confirms that Mr. Lombard considered his various commercial real estate holdings as *his personal assets*.

### D. Total Income/Salary for 1998

Mr. Lombard indicated in the FS that "My TOTAL INCOME for year ending 1998 was: "0", and further indicated either "0" or "N/A" for all other income categories on the FS, leaving

5

"Gross Income" and "Net Income" blank. Mr. Lombard's responses to the FDIC continued to support his claim that he is employed by his wife and children and received no compensation.

Yet, on his February 23, 1998 application to CNA, he stated annual income of $400,000.00. (Exhibit C). On his September 29, 1998 account application with PaineWebber, Mr. Lombard stated annual income of $1.2 million. (Exhibit E). Finally, on his November 1, 1998 account application with DLJ Direct, Inc., Mr. Lombard stated annual income in excess of $250,000.00. (Exhibit F). Thus, on several occasions, Mr. Lombard reported substantial income in 1998. In stark contrast, when responding to the very same inquiry by FDIC concerning income in 1998, Mr. Lombard reported zero income.

Mr. Lombard was also required pursuant to Question 46 of the supplement to his FS (Exhibit B) to disclose to the FDIC the financial statements that he submitted to CNA, Paine Webber and DLJ. Mr. Lombard failed to comply with FDIC's document request.

### E. Net Worth

Mr. Lombard stated a negative net worth of ($3,363,606.00) on his September, 1999 FS. Further, in response to Question 11, supplementing the FS (Exhibit B), Mr. Lombard stated: "I have no ownership interest in any partnership, joint venture, corporation, legal entity, the nature or percentage of the interest owned, and date and cost of each interest)[sic] Winsted Land Development (51%); PSC Center, LLC (1%); LTM Investments, LLC (1%) and Hardwoods, LLC (12.5%)".

Mr. Lombard's statement in response to Question 11, however, is inconsistent with his statements in a December 31, 1998 balance sheet that he submitted to Citizens Bank to obtain funding for a real estate development project. (Exhibit I). Mr. Lombard noted in the 1998

balance sheet that he had a 2% ownership in Lojac, LLC. The same balance sheet declared that Lojac, LLC had a net worth of $4,217,450.00 as of December 31, 1998. Thus, at a minimum, Mr. Lombard should have included in the FS his claimed 2% ownership interest in Lojac, LLC, or $84,349.00.

Furthermore, even if Mr. Lombard's estimated net worth statement in the September, 1999 FS had included his 2% stake in Lojac, LLC, it still would have been completely inconsistent with the net worth statements Mr. Lombard issued within a year before his FS submission to FDIC. Specifically, John Lombard reported a net worth of $16,460,000.00 on his February 26, 1998 CNA application (Exhibit C); a $4 million net worth estimate on his September 29, 1998 PaineWebber account application (Exhibit E); and a $1 million net worth estimate contained in his November 1, 1998 brokerage account application with DLJ Direct, Inc. (Exhibit F). Again, it is worth noting that Mr. Lombard's net worth estimates include his businesses' real estate holdings.

Once again, Mr. Lombard was under an obligation to disclose all three financial statements to the FDIC, pursuant to Question 46 of the supplement to the FS (Exhibit B).

### F. Monthly Income and Expenses

Mr. Lombard supplied an asterisk at the "income" portion of the FS, left all expense information blank, and noted "wife supports household". These statements are, at best, misleading since at the same time that Mr. Lombard completed the FS, he was paying household expenses from the Lombard Group business checking account.

Attached as Exhibit J is a September, 1999 Chase Mastercard statement addressed to Lisa Lombard, which was paid from the Lombard Group checking account on September 20, 1999,

just eight days after Mr. Lombard signed the FS. Mr. Lombard was the signatory on the Lombard Group check. Also included as part of Exhibit J is a sampling of other household expenses paid from the Lombard Group account, including school tuition, a donation, a second Chase Mastercard payment, and golf club expenses. All the Lombard Group checks were signed by John Lombard.

### G. Supplement questions to FS (Exhibit B)

Included as part of Mr. Lombard's FS submission are typewritten responses to supplementary questions 9 through 17, and 41 through 54. Each page was initialed by John Lombard, and provided by Mr. Lombard to the FDIC.

#### 1. Questions 13 through 16

Mr. Lombard failed to respond to questions 13 through 16 concerning financial investments, except to indicate his DLJ Direct, Inc. brokerage account had a zero balance. See response to Question 16 of supplement to FS (Exhibit B). This statement is incomplete and misleading for the following reasons.

Mr. Lombard's DLJ account was established in November, 1998 (Exhibit F), and was maintained through August, 1999 (Exhibit K). On August 26, 1999 (thirteen days prior to submitting his FS to the FDIC), Mr. Lombard liquidated the DLJ account, which had a balance of $15,145.77, and deposited the funds into the Lombard Group business account (Exhibit L).

Mr. Lombard was under a duty to provide complete financial information to the FDIC, yet never disclosed that he had transferred personal assets to the Lombard Group business account a matter of only days before submitting his FS to the FDIC.

## III. Argument

For purposes of negotiating a settlement with the FDIC, John Lombard distanced himself as far as possible from his company, the Lombard Group, and related limited liability corporations ("LLCs"), which were formed to facilitate and separate the various real estate development projects with which John Lombard was involved. In response to Schedule No. 10 at page 4 of the FS, John Lombard was required to list "Current and prior business relations". Nowhere in Mr. Lombard's response to Schedule No. 10 is there any reference to the Lombard Group, or related and active LLCs.

On the other hand, a much more accurate picture of John Lombard's extensive years of involvement in the company that bears his name, the Lombard Group, is evidenced by the following exhibits.

> 1. A December 26, 1997 letter from John Lombard on Lombard Group letterhead to Tolland Bank, inviting Bank representatives to the Lombard Group offices. John Lombard states "As you may know, Lisa's holdings are only a portion of what my various companies own. Our total assets are in excess of 35 million and cover some 18 properties. We have moved all of our companies to this new location, with some very impressive office suites." (Exhibit M).
>
> 2. Numerous statements in his CNA and Paine Webber applications which link John Lombard personally with the operation and assets of the Lombard Group and related LLCs. (Exhibits C and E)
>
> 3. The October 15, 1999 letter from John Lombard on Lombard Group letterhead to a Citizens Bank representative referencing various real estate projects that John Lombard was involved in. (Exhibit H).

> 4. The subsequent February 4, 2000 Citizens Bank internal memorandum making numerous references to John Lombard's personal connection to the Lombard Group and its assets: "John and Lisa Lombard have been Citizens Bank commercial customers for the past 3+ years"; "We are also negotiating with the Lombards to finance a to-be constructed retail complex . . ."; "The Lombard Group, a property management company established and operated by John Lombard . . ."; ". . . I am of the opinion that John and Lisa Lombard have the financial ability to support the loan." (Exhibit N).

The Government presumes that John Lombard may undoubtedly rely on a hyper-technical defense, arguing that at the time he completed the FS, he did not "personally" hold title to any real estate, nor have an interest in any income that flowed from real estate. Such an argument, if raised, must fail because of the following reasons:

First, it is inescapable that John Lombard failed to list the Lombard Group and related, active, LLCs in response to Schedule 10 at page 4 of the FS. Note, for example, that at the same time John Lombard was negotiating multi-million dollar deals with Citizens Bank using Lombard Group letterhead, he was careful to correspond with the FDIC using only personal letterhead. (Exhibit G).

Second, it is also unavoidable that John Lombard held out Lombard Group assets as his own to other financial institutions like CNA and PaineWebber; or at a minimum, exercised control over Lombard Group assets as evidenced by the Citizens Bank internal memorandum, and paid for personal expenses from the Lombard Group bank account.

Finally, and most importantly, is Paragraph 10 of the Settlement Agreement, which warned of not only making false statements, but also *inviting* reliance upon a false statement. Paragraph 10 guarded against precisely the situation at issue here: ". . . provid[ing] material

10

information to the FDIC which is substantially inaccurate or incomplete, in a manner which would affect the fundamental premises on which this Settlement Agreement is based . . ."

What is significant here is not only the skeletal, bare minimum financial information that John Lombard did provide in his FS (while knowing that the FDIC would rely upon it); but more importantly, it is significant to recognize the information that John Lombard failed to provide. John Lombard failed to openly discuss the financing he was negotiating with Citizens Bank. John Lombard failed to disclose his extensive involvement with the Lombard Group and related LLCs. John Lombard failed to disclose the substantial business assets which were available for his personal use. All of these factors (and, no doubt, countless other details), were material to the settlement negotiations and ultimately adversely affected the "fundamental premises" of the settlement process.

John Lombard may also attempt to hide behind his wife and children again, asserting that he was merely a caretaker of their assets. The Government invites John Lombard to offer evidence that the assets of his wife and minor children were derived from sources other than the Lombard Group and related LLCs. Mr. Lombard should also plan to offer evidence showing that Lisa Lombard was not merely a limited or straw participant, but the driving force behind the Lombard Group and its various development projects. Moreover, even if John Lombard is successful in showing that he was merely a caretaker of the multi-million dollar holdings of his family, he will be hard pressed to show that based upon a reasonable standard applied by the Court, a fair compensation for all of his efforts was zero.

The Government respectfully submits that Mr. Lombard ignored his obligations[2] under the FS and the Settlement Agreement, and should show cause why the judgment entered in this case should not be enforced against him. For all of the foregoing reasons, and in the interest of justice, the Government respectfully requests that an Order to Show Cause be entered and that a corresponding hearing be scheduled.

The Government further requests that in the event that its Motion for Show Cause hearing is granted, the Court further order that John Lombard and/or individuals acting on his behalf, be ordered not to transfer, assign or otherwise dissipate any asset in which John Lombard has an interest pending the Show Cause hearing. This request is made pursuant to 28 U.S.C. §§ 1651 and 3202. A proposed Order is attached to the Government's motion for the Court's consideration.

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

*/s/ Christine Sciarrino*

CHRISTINE SCIARRINO
ASSISTANT U.S. ATTORNEY
P.O. BOX 1824
NEW HAVEN, CT 06508
(203) 821-3780
FEDERAL BAR NO. CT3393

---

[2] The signature page of the FS (Exhibit B), signed by John Lombard, certified that "the figures and statements . . . and all representations herein are true and complete and give a correct showing of my/our financial condition as of September 12, 1999."

12

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, postage prepaid, on this 3rd day of September, 2004, to:

William L. Stevens, Esq.
St. John, Scappini, Lombard & Stevens
13 First Avenue
Waterbury, CT   06710-2290

CHRISTINE SCARRINO